In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2491

RHODA HOPGOOD, on behalf of LG, a minor,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:07-CV-671-PJG—**Patricia J. Gorence,** *Magistrate Judge.*

ARGUED MARCH 30, 2009—DECIDED AUGUST 25, 2009

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* The mother of LG, a minor, applied for Supplemental Security Income ("SSI") after LG's diagnosis with Attention Deficit Hyperactivity Disorder ("ADHD"). Following a hearing, the administrative law judge ("ALJ") denied benefits. In determining that LG was not disabled within the meaning of the Social Security Act and ineligible for SSI payments, the

ALJ made conclusory statements that contradicted the evidence presented and failed to address portions of medical and school records that were favorable to LG. As a result, we conclude that the ALJ's decision was not supported by substantial evidence, and we remand for further proceedings.

## I.  BACKGROUND

Rhoda Hopgood filed an application in June 2004 for SSI on behalf of LG, her minor son, alleging disability due to ADHD. The SSI application was initially denied, and Ms. Hopgood sought a hearing. Testimony at the August 15, 2006 hearing and other evidence established that LG was born in 1990 and was diagnosed in 1997 with ADHD, which resulted in academic and behavioral problems.[1] LG, who was 15 at the time of the hearing, testified that he sometimes forgot to brush his hair and that his mother had to tell him to take a shower and brush his teeth. He also testified that he had difficulties in school and did not understand some of the work despite help from his teacher. LG stated that he some-times walked out of his classroom, wandered the halls, and received many suspensions and detentions from school for fighting. Finally, he mentioned that he fought with his sister, who was 12 at the time, broke drawers and hit doors when he became angry, and ex-plained that the medication he took made him sleepy.

---

[1]  We refer to LG's medical and school records where relevant in the analysis section of the opinion.

Ms. Hopgood testified that in the previous school year LG frequently had been suspended or had to serve detention for being disrespectful to teachers, fighting, and walking the halls. She further explained that in addition to having to remind LG daily to bathe and brush his teeth and hair, she also had to tell him to complete his weekly chores and that as a result LG talked back to her. She testified that police were called once when LG and his friends got into a fight with a group of other boys. As a result, LG received court-ordered community service, and he completed his service by performing maintenance at the Salvation Army where Ms. Hopgood worked. She also said that LG failed the fourth grade and that in the previous school year had brought homework home only two or three times. Ms. Hopgood testified that she always asked him about his homework and that when LG's explanations did not pan out, she monitored a progress report system created by his teachers until LG suddenly stopped bringing the reports home. Ms. Hopgood explained that LG had been taking Risperdal for more than a year, but that he remained off task at school until she brought this to the attention of his psychiatrist, who then increased his dosage to twice a day. She further stated that the Adderall LG had previously been prescribed made him act "like a zombie"—he would just sit in his room, watch television and sleep. Ms. Hopgood explained that LG was incapable of riding a city bus or going to the mall by himself.

Following the hearing, the ALJ issued a decision finding that LG suffered from ADHD, but was not

disabled because his impairments did not meet, or medically or functionally equal, the criteria required under the Social Security Administration's Listing of Impairments. The ALJ also found the testimony of Ms. Hopgood to be "generally credible," but tending to show that LG was not disabled. The Appeals Council denied review, leaving the ALJ decision as the final one of the Commissioner of Social Security. Ms. Hopgood sought judicial review pursuant to 42 U.S.C. § 405(g), and a magistrate judge, presiding by consent, upheld the denial of benefits. This appeal follows.

## II. ANALYSIS

### A. The ALJ's determination was not supported by substantial evidence.

We reverse the Commissioner's final decision only if it is not supported by substantial evidence or is based on a legal error. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). But if the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

We begin our discussion with the ALJ's finding that LG's impairment is not functionally equivalent to the listing for ADHD. *See* 20 C.F.R. pt. 404, subpt. P, App. 1,

§ 112.11. A child qualifies as disabled and therefore may be eligible for SSI if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and the impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(C)(i). Whether a child meets this definition requires a three-step analysis. 20 C.F.R. § 416.924(a). First, if the child is engaged in substantial gainful activity, the Social Security Administration ("SSA") will deny the claim. *Id.* Second, if the child does not have a severe medical impairment or combination of impairments, then he is not disabled and his claim will be denied. *Id.* Third, the child's impairments must meet a duration requirement and must meet, medically equal or functionally equal, the severity of any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1. *Id.*

At issue is whether LG's impairments functionally equaled the listings. To determine if an impairment is functionally equivalent to a listing, an ALJ analyzes the severity of the impairment in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To functionally equal the listings, the ALJ must find an "extreme" limitation in one category or a "marked" limitation in two categories. 20 C.F.R. § 416.926a(a). A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or

complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when a child's "impairment interferes *very seriously* with [his] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(I) (emphasis added).

The ALJ found that LG established the first two steps of the three-part inquiry because he had not engaged in substantial gainful activity and because he suffers from ADHD. The ALJ then determined that LG had less than "marked" limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. The ALJ found no limitations in the other categories. Only the three domains in which the ALJ found less than marked limitations are at issue in this appeal.

### 1. Acquiring and using information

Acquiring and using information refers to how well a child acquires or learns information and how well he uses the information he has learned. 20 C.F.R. § 416.926a(g). Adolescents between the ages of 12 and 18 should be able to demonstrate what they have learned in academic assignments and be able to use what they have learned in daily living situations without assistance (e.g., going to the store and using public transportation). 20 C.F.R. § 416.926a(g)(2)(v). They should be able to "comprehend and express both simple and complex ideas" and use "complex language in learning and daily living situations." *Id.* They should also learn to apply these skills practically in order to enter the workplace after finishing school. *Id.*

The ALJ found LG had less than marked limitations in this domain based on statements from his teachers and the conclusions of four of LG's doctors, but the ALJ did not articulate what statements or reports supported this finding. The ALJ acknowledged LG's placement in special education and noted his level of academic knowledge. The ALJ stated LG's grades improved to As, Bs, Cs and Ds in his Individualized Education Program ("IEP"). The ALJ also noted a February 1, 2006 IEP report, which stated LG had difficulties beginning and completing assignments, but was capable when he remained focused and on task. Finally, the ALJ mentioned that an eighth grade teacher reported LG required additional explanation and examples to grasp new concepts.

Ms. Hopgood argues that the ALJ did not explain what in the teachers' reports supported the ALJ's findings and that the ALJ failed to discuss several portions of the teachers' reports that were favorable to LG. Specifically, the ALJ did not address the report of Ms. Johnson, LG's eighth grade special education teacher, that indicated "obvious" or "serious" problems in six of the ten activities listed on an SSA form for acquiring and using information. The ALJ also did not address the report of Ms. Mathew, another of LG's special education teachers, explaining that he had "obvious" problems in all areas related to this domain. Ms. Hopgood criticizes the ALJ for finding LG improved his grades, when under his IEP he was required to turn in only 60% of the assignments given to other children in his special education class. Ms. Hopgood further argues that the ALJ failed to explain his reliance on the doctors' reports and that he ignored portions of

these reports favorable to LG, including, for example, Dr. Polczinki's opinion that LG's medications significantly impacted his ability to function. Finally, the ALJ failed to address the testimony of Ms. Hopgood, who testified that LG could not catch a city bus or go to the store alone. The Commissioner counters that the ALJ was not required to describe all of the evidence in detail, that he did not need to explain the teachers' reports because they were consistent with his findings, and that the ALJ indirectly took the effects of LG's medications into account because the evaluations occurred when he was on medication.[2]

Several aspects of the ALJ's analysis in this domain strike us as deficient. Specifically, the ALJ failed to explain why he did not credit portions of the record that were favorable to LG, including the teachers' reports that found LG had serious or obvious problems in this domain. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007). The ALJ's conclusion that LG's grades improved to As, Bs, Cs and Ds, did not take into account that LG's IEP required him to turn in only 60% of his assignments, which shows that teachers recognized LG's limitations. Moreover, the ALJ's assessment of Ms. Hopgood's testimony is less than complete. The ALJ found Ms. Hopgood to be "generally credible," but did not

---

[2] We decline to address the Commissioner's final argument that the teachers' reports stating LG had "obvious" problems equated to less than marked limitations because the ALJ never offered this rationalization in making his determination.

explain why he did not find her testimony regarding LG's limited functioning in this domain persuasive. Ms. Hopgood testified about LG's inability to use public transportation or go the store alone—a skill set specifically addressed in the regulation related to this domain. *See Giles*, 483 F.3d at 489 ("If . . . [claimant's] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [the child] was markedly limited in attending and completing tasks."). Furthermore, the ALJ did not explain its reason for finding Ms. Hopgood generally credible, as required for the benefit of subsequent reviewers. *See id.* at 488.

### 2. Attending and completing tasks

Attending and completing tasks refers to how well the child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h). Adolescents should be able to pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, independently plan and complete long-range academic projects, organize materials and plan time to complete school assignments. 20 C.F.R. § 416.926a(h)(2)(v). They should also be able to maintain attention on a task for extended periods of time and not be unduly distracted by peers or unduly distracting to them in a school or work setting. *Id.*

The ALJ reasoned that he accepted LG's testimony that he needed to be in a collaborative environment to stay on task. The ALJ acknowledged that LG struggled in reading, math, and writing. But the ALJ found that LG's academic deficiencies were likely due to his frequent absences and failure to complete assignments outside the classroom. He noted that teachers described LG's lack of interest and failure to participate in school-work. The ALJ noted LG's A, B and C grades in the previous school year. The ALJ accepted LG's ADHD diagnosis and concluded that any limitations he had were based on his absences, incomplete homework, volitional choices on his part and lack of parental supervision and involvement.

Ms. Hopgood argues that the ALJ did not point to any evidence that she was a contributing factor in LG's problems and that the ALJ improperly blamed LG for his difficulties by attributing them to volitional choices. Ms. Hopgood further contends the ALJ ignored favorable portions of doctors' and teachers' reports relating to this domain. Finally, she argues that LG never made the statement that he needed to work in a collaborative environment to stay on task. The Commissioner maintains that teachers' and doctors' reports are consistent with the ALJ's findings because none said LG had a "serious" limitation in this domain, and the teachers stated that he missed class and frequently failed to do homework. The government also notes that Ms. Hopgood testified that sometimes LG did not just forget to complete tasks, he refused to do them.

We find Ms. Hopgood's arguments relating to this domain to be persuasive. Even if we accept the Commissioner's argument that the teachers' and doctors' reports do not conclusively establish marked or extreme limitations, which in and of itself would be difficult to do since the ALJ failed to address these reports with specificity, we are troubled by the ALJ's conclusion that LG's problems are a result of volitional choices or lack of parental involvement. Indeed, the record shows the contrary to be true. School reports indicate that Ms. Hopgood was involved with LG's teachers and informed the school that she was concerned about his academics and behavior problems. Ms. Hopgood requested that he receive extra help at school in order to make academic progress. She also asked that the school start a daily behavior sheet so she could monitor LG, and she developed a system to reward LG for good behavior. Moreover, Ms. Hopgood attended family therapy sessions with LG at Shorehaven Behavioral Health. The ALJ failed to point to any evidence supporting the theory that Ms. Hopgood was a contributing factor in LG's problems and in fact ignored evidence that she made efforts to assist him. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("There is little evidence in the record regarding the origin of [claimant's] low IQ scores and no evidence that an enriched school environment would remedy the situation. This assessment is the result of a hunch and an ALJ may not rely on a hunch.").

Furthermore, we are troubled by the ALJ's conclusion that LG's problems were a result of volitional choices.

The ALJ did not point to any medical evidence supporting his finding that LG's difficulties were of his own doing, which flies in the face of our instruction that determinations must be based on testimony and medical evidence in the record. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). The record demonstrates that LG could not control himself, which is precisely why doctors prescribed numerous medications to him and why his IEP required him to complete only 60% of the assignments given to his classmates. These special accommodations indicate that teachers and medical professionals do not believe LG's problems occur by choice. As a result, we reject the ALJ's line of thinking that LG is to blame for his difficulties, which are textbook symptoms of ADHD. We further note that, like Ms. Hopgood, we failed to find any reference in LG's testimony that he needed to work in a collaborative setting in order to remain on task.

### 3.  Interacting and relating with others

Interacting and relating with others refers to how well the child initiates and sustains emotional connections with others, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). An adolescent should be able to initiate and develop friendships with same-aged children, relate appropriately to other children and adults, and begin to be able to solve

conflicts between himself and peers or family members or other adults. 20 C.F.R. § 416.926a(i)(2)(v). The child should be able to express his feelings and follow social rules for interaction and conversation. *Id.*

The ALJ found LG's ability to interact socially was not "completely impaired." The ALJ found that LG socializes with friends in the neighborhood and gets along relatively well with his family, save for arguments with his sister over use of the phone. The ALJ noted that Ms. Hopgood testified that there were no significant problems with his behavior except a tendency to become quickly grumpy, moody, or rebellious. The ALJ acknowledged that LG's behavior escalated in April 2006, evidenced by several suspensions, but that it improved with medication according to Dr. Semon. The ALJ also noted LG leaves class and wanders the halls, but that his eighth grade teachers said he is a good worker and can understand concepts when focused. Finally, the ALJ stated records showed LG could behave acceptably, but that he often was not motivated to do so.

Ms. Hopgood asserts that the ALJ's conclusion that he was not "completely impaired" misstates the regulations, which require only a serious interference. Ms. Hopgood also contends that the ALJ blamed LG for his problems when he found LG was not "motivated" to comport his behavior. Ms. Hopgood finally argues the ALJ ignored favorable portions of doctors' and teachers' reports relating to this domain and ignored Ms. Hopgood's testimony about his behavior problems that resulted in suspensions and a call to police. The Commissioner

counters that the ALJ aptly described LG, and not the legal standard, as not "completely impaired." The Commissioner also maintains that the ALJ did not have to fully discuss teachers' and doctors' reports, because his findings were consistent with the reports that indicated LG had only "slight" or "obvious" problems in this domain.

Ms. Hopgood is correct that the regulations do not require a complete impairment, only serious interference, to qualify as a marked limitation, *see* 20 C.F.R. § 416.926a(e)(2)(i), but we are not convinced that the ALJ's statement referred to the regulations themselves and not merely his analysis of LG's limitations. Although the ALJ stated LG's behavior could be different if he was motivated, he did not point to any evidence demonstrating this. In fact, LG had been prescribed medication since 2004, but even the medication did not ameliorate his behavior as shown through his continued fights and multiple suspensions. The ALJ's conclusion that eighth grade teachers reported that LG could be a good worker if he remained focused ignores the evidence that shows LG could not focus because of his ADHD. For example, in the same report to which the ALJ referred, the teacher wrote that LG's disability affected his involvement and progress with the curriculum and that his attention span, inability to focus and impulsivity interferes with his learning. The ALJ failed to explain how this and other favorable portions of the record did not persuade him that LG was disabled. *See Giles*, 483 F.3d at 488. Although the ALJ pointed to Dr. Semon's opinion that LG was better

on medication, the ALJ did not address a portion of Dr. Semon's notes where he stated that Adderall was not helpful and that LG continued to be combative with his younger sister. Finally, the ALJ failed to address reports favorable to a finding of disability, including an October 28, 2004 report from one of LG's special education teachers, Mr. Eckman. Contrary to the Commissioner's assertion that teachers found LG's limitations in this domain to be "slight" or "obvious," Mr. Eckman determined that LG had a "very serious" problem with respecting/obeying adults in authority on an hourly basis. He further reported that LG had a "serious" problem in following rules on an hourly basis and in using language appropriate to the situation and listener on a daily basis. The ALJ erred when he failed to explain why he disregarded this pertinent evidence. *Murphy*, 496 F.3d at 634-35.

## III. CONCLUSION

For the reasons explained above, we VACATE the decision of the district court, and REMAND the case to the Social Security Administration for further proceedings consistent with this opinion.