NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 15, 2009
Decided January 26, 2010

**Before**

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-1633

| | |
|---|---|
| GERALDINE BUCKHANON<br>ex rel J.H., a minor,<br>　　*Plaintiff-Appellant,* | Appeal from the United States District<br>Court for the Eastern District of<br>Wisconsin. |
| *v.* | No. 08-C-221 |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>　　*Defendant-Appellee.* | William E. Callahan, Jr.,<br>*Magistrate Judge*. |

**O R D E R**

Geraldine Buckhanon, the legal guardian of J.H., applied in early 2005 for Supplemental Security Income on the minor girl's behalf. Buckhanon asserted that J.H. suffers from "mental health problems," learning and cognitive impairments, and speech and language deficits. The Social Security Administration denied benefits at all stages, and a magistrate judge, presiding by consent, upheld the agency's determination. On appeal,

Buckhanon argues that the Administrative Law Judge ignored or mischaracterized important evidence and failed to explain her conclusions. We uphold the denial of benefits.

J.H. was 8 years old in 2003 when she saw her mother suffer a seizure and die. By the end of 2004 her pediatrician had referred J.H. for psychological evaluation because of reported difficulties with learning, behavior, and attention. When he first examined J.H. in November of that year, psychologist Stanley Rubinstein observed that her affect, speech, and thought processes were all within normal limits. He soon concluded, though, that she suffered from adjustment disorder with depressed mood, and throughout 2005 and 2006 he remarked on what he saw as J.H.'s illogical or slow responses to questions, immature and defiant behavior, short attention span, fantastic thought, guardedness, and unreliability as a narrator. These traits suggested to him that she might also suffer from attention deficit hyperactivity disorder or oppositional defiant disorder. He characterized J.H. as "sexually precocious" and noted that she had told him that she was molested by a relative at age 8. But while Dr. Rubinstein did document setbacks and behavioral problems at home and school, he also observed a trend of improving behavior and goal-directed thoughts, especially in 2006.

In June 2005, when Buckhanon's application for benefits was pending, Dr. Rubinstein referred J.H. to a psychiatrist for evaluation of her "unrealistic" and "fantasy laden" thoughts. J.H. told the psychiatrist that at times her dead mother and Satan spoke to her. But she was cooperative and alert, and the psychiatrist observed that she displayed average intelligence and clear thought processes. He diagnosed major depression with psychotic features and post-traumatic stress disorder, and he prescribed Ritalin and Risperdal for distractibility and irritability.

Later that same month a state-agency psychologist reviewed the medical record and opined that J.H.'s impairments did not meet or medically equal any of the listings of impairments in 20 C.F.R. pt. 404, subpt. P, App. 1. The psychologist acknowledged that J.H. exhibited a "marked" limitation in the functional domain of "attending and completing tasks" but concluded that her limitations in other domains were less than marked. A state-agency colleague seconded this opinion.

For reasons unexplained in the record, in August 2006 Buckhanon switched from Dr. Rubinstein to Freda Mitchell, a therapist at Aurora Family Service. J.H. reported that she enjoyed sex, which she said she'd had at ages 9 and 10. During two months of treatment, Mitchell documented that J.H. denied being anxious but appeared to process little of what occurred during their sessions, and was easily distracted and focused on sex. Mitchell suspected sexual abuse and difficulty adjusting to stress. But she also noted that J.H. sometimes appeared jovial while relating news of successes at school. A psychiatrist at the

clinic, Dr. Hilary Wynn, also evaluated J.H. and diagnosed post-traumatic stress disorder but concluded that psychotropic medication was unnecessary and would not be helpful. She noted that J.H. was "functioning relatively well in school" and was not exhibiting aggression or a lack of control. Her mood was good, her speech and grooming normal, and her insight fair, but she did evidence obsessive tendencies and poor judgment. When asked, J.H. denied experiencing the auditory hallucinations reported earlier.

Throughout this period, school officials were working with J.H. In March 2004, a special-education team had drafted an initial Individualized Education Plan—a plan created for students qualifying for assistance under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415—describing academic delays and difficulty with friendships and staying on task. A second IEP was formulated in January 2005. This time, J.H.'s evaluators noted her distractibility, social immaturity, and behavioral outbursts. The school psychologist also remarked on J.H.'s failure to develop meaningful relationships, her poor motivation, and her "scattered" functioning. The IEP acknowledged that J.H. met only two out of three necessary criteria for cognitive disability, but designated her as having some "other health impairment." A new IEP in January 2007 documented "extremely inappropriate" and "significantly more severe" verbal and physical behaviors that teachers said impeded her learning. The record also includes one teacher questionnaire, filled out in 2005, documenting some of J.H.'s difficulties in activities from the domains listed in 20 C.F.R. § 416.926a(b)(1).

At her hearing before the ALJ in May 2007, at which counsel represented the plaintiff-appellant, J.H., by then age 12, testified that she had no trouble with personal hygiene, grooming, or keeping her room clean. When asked about school, she said that she was doing "[a]ll right," although she conceded that she didn't enjoy math. She testified that she had received grades of B and C on her most-recent report card and volunteered no difficulties at school. She said she sometimes got into fights that prompted write-ups or phone calls to her grandmother but noted that these incidents occurred less frequently than before. She admitted getting a detention for running through the halls in 2006 but described no similar incidents since that time. She also reported that she once drank beer found in the refrigerator, that she had consumed alcohol given to her by her grandmother the previous Christmas, and that at age 7, when her mother was alive, she had used marijuana.

J.H. told the ALJ that she had friends whom she played with at school and in the neighborhood. Her favorite activities included basketball, playing with friends, and watching television, and she said she was attending an after-school program where she did homework and participated in organized activities. There were no difficulties getting along with teachers, students, or family, she said, except that her brother sometimes got "on [her] nerves" and she had a rivalry with one girl at school. J.H. added that she was benefitting "a

little bit" from participating in group therapy at Aurora Psychiatric Hospital. J.H. had been attending that program since February 2007, and a psychiatrist there had diagnosed her with a mood disorder.

Buckhanon testified that, other than one suspension in 2006, she knew of no disciplinary problems at school and no recent problems with truancy. She confirmed that J.H. maintained her hygiene and grooming, played and did homework in the after-school program, and spent time outdoors with other neighborhood children. She admitted giving J.H. alcohol at Christmas.

When asked directly why she thought J.H. was disabled, Buckhanon said only that she sometimes had difficulty understanding what J.H. was saying. She conceded, however, that she had not sought to have J.H. evaluated or treated for speech or language deficits. She then reiterated that J.H. had witnessed her mother's death and explained that J.H. dreamed about and missed her. She asserted that J.H. moved around a lot in bed, but she did not know if this meant J.H. did not sleep well. When asked if there was anything else Buckhanon wished to add about J.H., she said no. With prompting from counsel, however, she recalled that J.H. had at some point consumed dog food and once claimed to have eaten some cat food. She noted J.H.'s interest in sex, but said that problems with neighborhood boys had been cleared up when Buckhanon's boyfriend spoke with their parents; there were no further questions on this topic. Buckhanon never described hallucinations, defiance, or cognitive deficits.

At closing, the primary argument by counsel for the plaintiff-appellant was that the "very intensive treatment" J.H. received was something "they wouldn't be giving her unless she was feeling seriously impaired." No experts testified.

The ALJ applied the 3-step analysis (as opposed to the 5-step analysis used for adults) to determine whether J.H. qualified for disability benefits. *See* 20 C.F.R. § 416.924(a); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). The ALJ concluded, first, that J.H. had not been engaged in substantial gainful activity and, second, that she suffered from a combination of impairments that was severe: post-traumatic stress disorder, adjustment disorder, depression, mood disorder, attention deficit disorder, obsessive compulsive disorder, reactive attachment disorder, and antisocial personality disorder. Further, the ALJ noted that J.H. suffered from asthma, allergic rhinitis, and dermatitis. At step three, however, the ALJ found that J.H.'s impairments did not meet or medically equal a listed impairment, *see* 20 C.F.R. pt. 404, subpt. P, App. 1, nor did they functionally equal a listing, because her limitations in all functional domains, *see* 20 C.F.R. § 416.926a(b)(1), were less than marked.

The Appeals Council denied Buckhanon's request for review, and a magistrate judge upheld that final decision. Buckhanon filed treatment notes from Aurora Psychiatric Hospital in 2007 with the Appeals Council, but she conceded at oral argument in this court that the notes are not properly part of the record for our review. We therefore omit a recitation of the information contained in them.

On appeal, Buckhanon argues that the ALJ ignored or mischaracterized key evidence and failed to justify the conclusions she reached. We will overturn the Commissioner's final decision only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review. *Hopgood*, 578 F.3d at 698. Although ALJs need not address every piece of evidence in detail, they must address significant evidence and explain why strong evidence favorable to the claimant is overcome by the other evidence. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

Buckhanon first takes aim at a finding that the ALJ did not make *explicitly*; she argues that SSR 96-7p required the ALJ to make express findings about the credibility of both Buckhanon and J.H. It is plain, however, that the ALJ *believed* the testimony of both J.H. and Buckhanon. And although credibility findings should be express and reasoned, *see Giles*, 483 F.3d at 488; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002), that preference is designed to force ALJs to proceed cautiously before rejecting specific portions of a claimant's testimony as not credible, *see Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003). Here, it is evident from the briefing that plaintiff-appellant's counsel appreciates that the testimony elicited from J.H. and Buckhanon was less than helpful, and we do not see how the claimants could have been prejudiced by the ALJ's decision not to give a detailed explanation for her obvious *reliance* on their testimony.

J.H.'s testimony paints a picture of a child who, despite several difficulties, performs reasonably well in school and exhibits mostly unsurprising behaviors in and out of the home. And as for Buckhanon, she accurately concedes in her brief that during her testimony she "could not really articulate her granddaughter's difficulties." Only one of her remarks, that she often cannot understand J.H.'s conversation, is arguably inconsistent with the ALJ's decision. But this vague assertion, coupled with the absence of any evidence that anyone other than Buckhanon shared this difficulty, is not the sort of significant testimony that an ALJ is required to grapple with at length. And at the ALJ hearing, counsel expressed no surprise about the testimony of J.H. or her grandmother and made no effort to impeach either. At this late stage, Buckhanon cannot deploy SSR 96-7p to attack the ALJ's reliance on her own and J.H.'s testimony.

Next, Buckhanon argues that the ALJ provided no rationale for her finding that J.H.'s combination of impairments did not meet or medically equal any of the listings of impairments in 20 C.F.R. pt. 404, subpt. P, App. 1. Although the ALJ cited the listings she considered and discussed the evidence of J.H.'s impairments in separate parts of the decision, Buckhanon treats the finding as unreasoned because the ALJ did not incorporate that information within a single paragraph. There is no requirement of such tidy packaging, however; we read the ALJ's decision as a whole and with common sense. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The cases Buckhanon invokes, *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004), and *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003), do not help her because those cases turned on an ALJ's failure to discuss critical evidence of medical equivalence, and that did not happen here.

Alternatively, Buckhanon contends that the ALJ lacked sufficient opinion evidence from experts to decide on medical equivalence. At oral argument, Buckhanon conceded that both state-agency consultants had opined without contradiction that J.H. did not suffer from impairments that met or medically equaled a listing. But she argued that the ALJ was compelled by SSR-96-6p to arrange sua sponte for a third medical expert to assess the impact of evidence generated after the state-agency consultants reviewed the medical record in June 2005, or else to recontact one of the original consultants for an updated opinion on medical equivalence. Yet SSR 96-6p requires an ALJ to secure another expert opinion only when, "in the opinion of the administrative law judge," new evidence might cause the initial opinion to change. SSR 96-6p, 1996 WL 374180, at *4.

In any event, although ALJs bear some responsibility for developing the administrative record, *see Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Smith v. Apfel*, 231 F.3d 433. 437 (7th Cir. 2000), they are also free to assume that a claimant represented by counsel has presented her strongest case for benefits, *see Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007)*; Glenn v. Sec'y of Health and Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987). Buckhanon, acting through counsel, knew already in 2005 that the state-agency consultants did not think that J.H. was disabled. And yet Buckhanon never presented an opinion on medical equivalence from those who treated J.H., nor did she ask the ALJ to recontact the state-agency consultants. All the while, however, Buckhanon was gathering other evidence for the record. The appropriate inference is that Buckhanon decided that another expert opinion would not help her. Given that inference and the record before us, we cannot conclude that the ALJ erred or that any putative error was harmful. The ALJ expressly relied upon the medical judgment of the state-agency consultants, and their uncontradicted opinions constitute substantial evidence, *see Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989), especially given that J.H.'s medical

providers have remained silent on the question, *see Scheck*, 357 F. 3d at 701; *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988).

Buckhanon then argues that the ALJ inadequately justified her finding that J.H.'s impairments did not functionally equal a listing. A child's impairments will functionally equal a listing if they result in either a "marked" limitation in at least two of six enumerated domains of functioning, or an "extreme" limitation in at least one. 20 C.F.R. § 416.926a; *Brindisi*, 315 F.3d at 785. A "marked" limitation interferes "seriously" with a child's ability to initiate, sustain, or complete activities in the domain, and an "extreme" limitation interferes "very seriously." 20 C.F.R. § 416.926a(e)2, 3; *Hopgood*, 578 F.3d at 699.

Buckhanon concentrates on four of the six enumerated domains, mounting her strongest challenge to the ALJ's finding that J.H.'s limitations in the domain of "attending and completing tasks" were less than marked. As Buckhanon observes, the state-agency consultants reported marked limitations in this domain, but the ALJ found otherwise without addressing their position. Yet if this omission was an error, it was harmless. The opinions of the state-agency consultants suggest only a "marked" limitation, not an "extreme" one, so a remand would help only if Buckhanon could point to a second with marked limitations, which she cannot.

The ALJ's treatment of the other domains discussed by Buckhanon is satisfactory. Buckhanon contends that the ALJ erred in the domain of "interacting and relating with others" by mischaracterizing the record as showing that, overall, J.H.'s condition was improving. But this conclusion is not a mischaracterization. Although the record does not tell a pat story of unmitigated improvements, there is nothing wrong with the ALJ's overall assessment, particularly in light of the testimony given by J.H. and her grandmother.

The same is true about the ALJ's evaluation of the domain of "acquiring and using information." Buckhanon argues that the ALJ focused exclusively on J.H.'s intellectual capacity and ignored evidence that her behavioral difficulties limit her *use* of the information she acquires. Yet the ALJ recognized both that J.H.'s behavior was a "major reason" for her academic difficulties, and that she was getting help for that behavior. J.H.'s testimony, together with Buckhanon's, confirmed that she was benefitting from treatment, that her behaviors were not particularly severe, and that, aside from some difficulty in math, things were going "all right" in school. In fact, as the ALJ observed, J.H. was formally tested in January 2005 before significant treatment had begun, and already then she was functioning in the "low average range." So there is nothing illogical about the ALJ's conclusion that, "on balance," J.H.'s limitations were less than marked.

As for the domain of "caring for yourself," Buckhanon contends that the ALJ erred by failing to address serially a catalog of instances of J.H.'s poor judgment. But the ALJ remarked generally on J.H.'s "immaturity and poor judgment," and specifically on J.H.'s interest in sex, as well as her two experiments with alcohol and her use of marijuana four or five years before the hearing. The ALJ determined that, "on the whole," these concerns did not outweigh J.H.'s testimony about her good hygiene, self-management, and participation in community activities and sports. There was no need to address each piece of evidence individually. *See Giles*, 483 F.3d at 488; *Zurawski*, 245 F.3d at 889. Buckhanon further contends that the ALJ engaged in baseless speculation in this domain by remarking that J.H. can manage her daily activities "when she wants to." But Buckhanon's contention is belied by her and J.H.'s own testimony.

Because the ALJ relied on substantial evidence in the record, especially testimony from J.H. and Buckhanon, and because the ALJ logically articulated the connection between that evidence and her conclusions, we uphold the denial of benefits.

The judgment is AFFIRMED.