In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2820

SEAN T. SCHAAF,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-cv-611—**Barbara B. Crabb**, *Judge*.

ARGUED JANUARY 26, 2010—DECIDED APRIL 26, 2010

Before BAUER, POSNER, and KANNE, *Circuit Judges*.

PER CURIAM. Sean Schaaf applied for Social Security disability benefits after he lost partial use of one arm in a snowmobile accident, claiming that he no longer could perform his past job as a mason or any other job. The Social Security Administration denied his claim after an Administrative Law Judge (ALJ) found that Schaaf can still perform light work. The district court

upheld that decision. On appeal Schaaf argues that the ALJ gave too little weight to both his treating physician's opinion and his own testimony about his physical limitations. We affirm the judgment.

## I. BACKGROUND

In February 2005 at age 31, Schaaf overturned his snowmobile and suffered a slight concussion and injuries to his back, chest, left arm, and right knee. Most of the injuries healed with time, but the arm and knee required surgery. Schaaf had damaged the nerves in his left brachial plexus, and the injury weakened the muscles in his shoulder and arm, leaving him with the use of his hand but unable to flex the arm or raise it in front of him. After physical therapy did not significantly improve mobility in that arm, Schaaf underwent nerve-transfer surgery in July 2005 in an attempt to regain more function in the muscles. Early the next year he also had reconstructive surgery on the torn ligaments in his right knee because, although he had regained nearly normal functioning, the knee still hurt when he ran.

Meanwhile, just weeks after the accident, Schaaf had applied for disability benefits, claiming that his left arm was paralyzed and his right knee impaired to a degree that prevented him from working. The Social Security Administration denied his application initially in June 2005, and, after retaining a lawyer, Schaaff requested reconsideration. Reconsideration was denied, and Schaaf requested a hearing before an ALJ.

The ALJ conducted the hearing in November 2007. The evidence before the ALJ included information from Schaaf and his mother as well as surgical records and notes from Schaaf's family doctor. In a Physical Activities Questionnaire completed just 4 months after the accident, Schaaf reported that he attended to his own personal hygiene, did his own shopping, and occasionally went fishing. But he complained that he was unable to rake or sweep and could not "do much" because of the accident. He said that pain prevented him from leaving the house more than once a day and kept him from sleeping more than 4 to 6 hours a night. Sometimes, he added, he napped for up to an hour a day. Schaaf also reported that he lived alone with his 3-year-old son, but he did not detail his caretaking responsibilities until he updated his application in March 2006. In that update Schaaf said that his arm injury had worsened after the surgery in July 2005. Nonetheless, he was getting his son ready in the morning for preschool, driving him most days to the bus stop 15 miles away, and preparing his breakfast and dinner. Schaaf complained, however, that he was unable to "do anything that requires two hands" and as a consequence was very depressed. He further reported that he experienced "constant pain—total discomfort at all times"—that affected his sleep. Schaaf's mother confirmed in her report on Schaaf's functioning that she helped him with housework and that he complained of constant pain.

The record before the ALJ also included Schaaf's medical records from the time of the accident through early 2006, shortly after his knee surgery. After the injury, doctors

had prescribed Neurontin, a nerve-pain drug, and Percocet, a narcotic pain reliever. *See* Mayo Clinic, Gabapentin (Oral Route), http://www.mayoclinic.com/ health/drug-information/DR600709 (last visited Apr. 19, 2010) (Neurontin); PHYSICIANS' DESK REFERENCE 1127 (63d ed. 2009) (Percocet). It is unclear how long Schaaf took Neurontin, but the medical records document his use of Percocet (or its generic) almost continuously after the accident. The physical therapist's notes detail Schaaf's progress until the nerve-transfer surgery. A few months after that surgery, Schaaf was referred back to physical therapy. But after his first evaluation in October 2005 he never returned and was discharged for noncompliance. A few months later, Schaaf had reconstructive surgery on his knee, but the record contains no post-surgery updates.

The medical record also includes progress notes from Dr. John Ingalls, Schaaf's personal physician, for the period from March 2005 through November 2007. Most of the entries document requests to refill prescriptions for pain medications, but in September 2005 Schaaf was examined, complaining of pain in his left arm at a level of 8 or 9 out of 10. Ingalls noted that Schaaf had been out of Percocet for 6 weeks and prescribed physical therapy (which Schaaf did not attend), more Percocet, and Gabapentin (the generic of Neurontin). After that Schaaf received almost monthly refills of Percocet, 90 pills at a time. He was not seen again for pain until July 2006 when, for the first time, he also complained of insomnia. Ingalls prescribed Benadryl for the insomnia and once more instructed Schaaf to get physical therapy. Ingalls's

treatment notes suggest that Schaaf went to physical therapy: "Treated by Robyn M. Formanek PT, MA. Has been trying to work. Lifting increases arm and neck pain." But absent from the record are notes or other documentation from the physical therapist, so it is impossible to say whether the results noted by Ingalls were communicated to him by the therapist or by Schaaf. Ingalls also examined Schaaf in November 2007—a few days in advance of the hearing before the ALJ—to assess his ability to work. At that appointment Schaaf told Ingalls that he typically takes Percocet at bedtime and as needed for pain, 3 pills at a time. Ingalls noted that Schaaf complained of chronic pain that he said caused insomnia. Ingalls concluded that Schaaf's pain and loss of mobility had led to "chronic fatigue and insomnia" and prescribed a new pain medication, Lyrica.

The ALJ considered three assessments of Schaaf's residual functional capacity: a November 2007 assessment from Dr. Ingalls and two assessments from state-agency physicians who reviewed Schaaf's medical records, first in June 2005 and later in May 2006. All three physicians agreed that only the arm injury affected Schaaf's ability to work, and only the doctor who reviewed his file in 2006 thought that Schaaf could not use his left arm at all. The first state-agency physician had concluded that Schaaf could feel with his left hand, and Ingalls gave an even more-positive assessment; he reported that Schaaf could perform fine manipulations, limited grasping, occasional carrying of up to 20 pounds, and occasional reaching at or below shoulder level. Both of the state-agency physicians concluded that Schaaf could

perform one-armed light work. Ingalls did not opine about the level of work that Schaaf could perform but, consistent with the other physicians, represented that Schaaf was unrestricted in other areas, such as walking, sitting, standing, bending, crouching, or operating machinery. Ingalls, though, checked yes when asked if there would be some days during "an average month" when Schaaf "would not be able to work at all." Ingalls speculated that Schaaf would miss a week or more per month but did not elaborate. The state-agency physicians used a different form that did not have this question.

At the hearing the ALJ heard testimony from Schaaf and a vocational expert. Schaaf testified that he was unable to work because of his arm injury, pain, and lack of sleep and said that he relies on his mother and friends to take care of his house. The ALJ asked Schaaf what he does with his time, and he responded, "Not much," without listing any activities that he does do. In response to his attorney's questioning, Schaaf reported that he is unable to sleep more than 1 to 3 hours a night because of the pain, which he described as rating a 10 out of 10. He said his medication does not take away the pain but makes him relax and forget about it. Then the ALJ asked Schaaf if he had participated in services from the Division of Vocational Rehabilitation, Wisconsin's job-assistance program for people with disabilities, and Schaaf responded that he started the process but did not follow through because, even though the program would pay for gas, he "didn't have the ride."

Next, the ALJ presented two hypotheticals to the vocational expert. In one, the ALJ asked whether unskilled,

light-work jobs were available for someone whose use of his left arm was limited to carrying 20 pounds, occasional reaching and fine manipulation, and frequent simple grasping. In the other, the ALJ posited no use of the left arm. In both cases the vocational expert testified that such a person could not perform Schaaf's former work as a mason. But he identified cashier as a job for a person with restricted use of one arm and security monitor for a person with limited to no use of one arm. Then, in response to questions by Schaaf's attorney, the vocational expert acknowledged that a person with "an impairment in concentration as a result of lack of sleep and medication" would not be able to be a security monitor. He also conceded that a person who missed a week of work per month would not be employable.

The ALJ, applying the 5-step analysis for evaluating disability, *see* 20 C.F.R. § 404.1520, concluded that Schaaf had not engaged in substantial gainful activity since the accident. The ALJ identified several severe physical impairments, including injuries to the left brachial plexus and thoracic nerve root, flaccid paralysis of the left arm, right knee ligament injury, and endplate compression fractures at T11 and T12, but no severe mental impairments, despite Schaaf's self-reported depression. The ALJ noted that the only injury still affecting Schaaf was the one to his arm but concluded that it was not severe enough to qualify as a listed nerve impairment, which requires, at a minimum, dysfunctions in two extremities.

Accordingly, the ALJ proceeded to analyze Schaaf's residual functional capacity. He found that Schaaf could

not lift anything with his left arm but could carry up to 20 pounds with it and occasionally perform fine manipulation, simple grasping, and reaching. He also found that Schaaf could otherwise lift and carry up to 20 pounds occasionally and 10 pounds frequently and could sit, stand, and walk for 6 hours of an 8-hour day. After the ALJ concluded that Schaaf could still perform light work with these limitations, he turned to whether Schaaf's reported symptoms—chronic pain and fatigue—rendered him disabled.

The ALJ found that Schaaf's medically determined impairments could reasonably cause chronic pain and fatigue but rejected Schaaf's claim that the intensity and persistence of his symptoms would limit his ability to work. Dr. Ingalls had opined that Schaaf would miss a week or more of work per month. But the ALJ found Ingalls's opinion in this respect unpersuasive because Ingalls did not explain his reasoning and his treatment notes did not fill in the gap. The only support the ALJ discovered in the treatment notes was Ingalls's November 2007 assessment of chronic fatigue and insomnia, which the ALJ determined did not provide a sufficient medical basis for the proffered limitation.

Dr. Ingalls's opinion is based primarily on Schaaf's reported symptoms, and so the ALJ evaluated Schaaf's hearing testimony about those symptoms and refused to fully credit his testimony because it conflicted with other parts of the record. For example, the ALJ noted that Schaaf testified that he does not do much during the day, but he reported a variety of daily activities in

his Physical Activities Questionnaire: he is the primary caregiver for his son 5 days a week, including the weekend; he is able to cook, drive, shop, and take care of his personal hygiene; and he goes fishing. Furthermore, the ALJ found it significant that Schaaf failed to attend his physical therapy appointments after the arm surgery and did not pursue available services from the Division of Vocational Rehabilitation. He questioned Schaaf's purported lack of transportation given that he or his mother drives Schaaf's son 15 miles to the bus stop every school day. Finally, Schaaf testified that the level of pain in his left arm was a 10 out of 10 all of the time, but the ALJ noted that examining physicians consistently described Schaaf as being in no acute distress, which he found inconsistent with Schaaf experiencing constant high-level pain. Accordingly, the ALJ concluded that Schaaf did not credibly allege an incapacity for all sustained work activity and stated that "to the extent that he is self-limited" such limitations are not a basis for finding disability.

The ALJ only briefly addressed the side effects from Schaaf's medications, concluding that "[t]here is no evidence that Mr. Schaaf's use of prescribed medication is accompanied by side effects that would interfere significantly with his ability to perform work within the restrictions outlined in this decision." The ALJ referred to Dr. Ingalls's treatment notes that showed Schaaf repeatedly denied memory loss, confusion, lack of concentration, or inability to cope with daily stresses.

Having determined Schaaf's residual functional capacity, the ALJ concluded that Schaaf could not perform his

past work as a mason but that jobs existed that Schaaf could perform. Relying on the testimony of the vocational expert, the ALJ found that even with his limitations Schaaf could perform the duties of a security monitor or cashier. The ALJ rejected Schaaf's argument that his pain and medication prevent him from the sustained concentration needed to be a security monitor, relying on Dr. Ingalls's treatment notes, which document Schaaf's repeated denials of any difficulty maintaining concentration. Accordingly, the ALJ deemed Schaaf to be not disabled and denied benefits. The Appeals Council denied review, and the district court upheld the ALJ's decision.

## II. ANALYSIS

When the Appeals Council denies review, the ALJ's decision becomes the final decision of the Commissioner. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). We review the ALJ's decision deferentially and uphold it if supported by substantial evidence. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Schaaf first argues that the ALJ should have granted controlling weight to all parts of Dr. Ingalls's report because Ingalls is his treating physician and, in his view, the report is well-supported and not inconsistent with the record. Accordingly, Schaaf contends, the ALJ was compelled to find him disabled because Ingalls

opined that he would miss a week or more of work a month and the vocational expert testified that missing so much work "would not allow for competitive employment."

The regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques[,]" and (2) it is "not inconsistent" with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *see Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). If the opinion is unsupported or inconsistent with the record, the ALJ may still choose to accept it, but if the ALJ rejects the opinion, he must give a good reason. 20 C.F.R. § 404.1527(d)(2); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Schaaf seemingly contends that because the ALJ did not point to contradictory evidence (expecting, perhaps, an opinion from a doctor saying that Schaaf could work a full month), Dr. Ingalls's finding must be well-supported. But Schaaf conflates the two areas of inquiry. The ALJ discounted Ingalls's opinion about Schaaf missing work because he found that Ingalls did not explain his opinion and his treatment notes do not clarify the doctor's reasoning. Although Schaaf insists that Ingalls's opinion is supported by substantial evidence in the record, we cannot find any "medically acceptable clinical and laboratory diagnostic techniques" documenting the symptoms that supposedly would prevent Schaaf from working. *See*

20 C.F.R. § 404.1527(d)(2). In Schaaf's best attempt to identify objective evidence supporting Ingalls's opinion, he states that his own complaints provide the necessary basis. But subjective complaints are the opposite of objective medical evidence and, while relevant, do not compel the ALJ to accept Ingalls's assessment. *See Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004). Ultimately, though, the ALJ rejected that part of Ingalls's report for the same reasons he rejected Schaaf's testimony about his symptoms: it is inconsistent with substantial evidence in the record.

To combat the ALJ's credibility finding, Schaaf argues that the ALJ improperly discredited his testimony and failed to develop a full and fair record about his pain symptoms. We review an ALJ's credibility determination deferentially and uphold it unless it is patently wrong. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). We look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

Schaaf insists that the ALJ should have questioned him to clear up any confusion surrounding the inconsistencies between his testimony and written statements. This failure, Schaaf argues, deprived him of a full and fair record, which the ALJ had an obligation to develop. But this contention requires little discussion. Regardless of any potential duty an ALJ may have to question a claimant who is represented by counsel, *see Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007); *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987),

Schaaf cannot prevail in this court unless he can show that he was prejudiced by the ALJ's failure to elicit more testimony, *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). And Schaaf offers no hint of what further evidence the ALJ would have elicited and thus has not shown prejudice.

Schaaf next asserts that it is "pure conjecture" for the ALJ to doubt that Schaaf suffers from a constant pain level of 10 out of 10 just because his physicians noted that he was in "no apparent distress" during appointments. Schaaf posits that, despite the excruciating pain, he is still able to maintain his composure or else relies on pain medication to "calm[] him enough to function." But the ALJ was entitled to infer that Schaaf would have told his doctors if he was experiencing excruciating pain. The record shows that Schaaf's assessment of his level of pain during doctor appointments rarely rose above a 7 and that both times he complained of pain to Dr. Ingalls, he had been out of Percocet. After these two complaints, Schaaf received monthly refills of Percocet and did not see Ingalls about pain in the year preceding his November 2007 evaluation. Notably, this is not a case where the ALJ ignored a claimant's extensive history of seeking pain-relief treatments. *Cf. Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (detailing claimant's history of pain treatments, including variety of strong drugs and surgical procedures); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (same). Instead, the absence of a history of seeking pain treatment despite other doctor visits suggests that Schaaf's current

treatment was effective. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

Schaaf contends, however, that the ALJ inadequately factored his medication into the analysis, ignoring both the amount of drugs he takes and their side effects. But we find that the record does not support the conclusions that Schaaf asks us to draw. As to the amount of medication, although it is clear that Schaaf has been on Percocet since the surgery, he has never testified in oral or written form about how many he takes a day. The record shows that Schaaf receives 90 pills about once a month, which averages to 3 a day. And he told Dr. Ingalls at the November 2007 visit that he usually takes 3 at once before bed, which maybe suggests that he uses them to sleep but also suggests that he gets by without them during the day. Without more evidence, it would be speculation to assume that 3 pills a day evinces extreme pain, especially since the maximum daily dosage recommended by Ingalls is 6 pills—1 pill every 4 hours as needed for pain.

Regarding side effects, Schaaf argues that his claims of drowsiness, fatigue, and lack of concentration "have ample support in the record." But our review of the record turns up nothing regarding side effects except for Schaaf's complaint in his 2006 amended disability application of "restlessness, dry mouth, [and] drowsiness" from Percocet. (The initial 2005 application listed no side effects.) Nor does the record contain information about common side effects of Percocet, and it would again be speculation to assume that Schaaf automatically

suffers from those side effects. Furthermore, there is no indication in the record that Schaaf complained of side effects to his doctors or inquired into changing pain medication until, perhaps, November 2007. Additionally, as the ALJ points out, Ingalls's treatment notes indicate that Schaaf denied memory loss, confusion, lack of concentration, and inability to cope with daily stresses. Accordingly, the ALJ did not err in concluding that there was no evidence that any side effects from medications would prevent Schaaf from working.

## III. CONCLUSION

Therefore, we AFFIRM the denial of benefits.