NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 7, 2010
Decided July 28, 2010

**Before**

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 09-3897

| | |
|---|---|
| CLARK ABBOTT, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Central District of Illinois. |
| | |
| *v.* | No. 08-2177 |
| | |
| MICHAEL J. ASTRUE, | David G. Bernthal, |
| Commissioner of Social Security, | *Magistrate Judge.* |
| *Defendant-Appellee.* | |

**O R D E R**

Clark Abbott, born in 1947, filed his second application for Social Security disability benefits, claiming that heart disease, high blood pressure, and arthritis in his knee left him unable to work by the end of 2004, his last date insured. The administrative law judge determined that Abbott was not disabled because, he found, Abbott had acquired skills from his past work that he could transfer to a new job within his residual functional capacity. That ruling forms the heart of this appeal: Abbott argues that the ALJ erred in finding that he had transferable skills. Because the ALJ did not make the required findings of fact about what skills Abbott had acquired or how they would transfer to another position, we remand to the agency for further findings of fact.

## I.  Background

Abbott suffers from numerous ailments, including an arthritic knee, heart disease, high blood pressure, high cholesterol, peripheral vascular disease, and kidney disease.  He had knee surgery in 1991 following an injury to his arthritic knee, and afterwards he reported continued swelling and pain.  By 2005 a doctor recommended a total knee replacement, which Abbott underwent the following year.  Adding to his health problems, he had multiple heart attacks, two in 1998 and another in 2004 that led to a triple bypass.  Additionally, his high blood pressure and high cholesterol contributed to his peripheral vascular disease, which narrowed the arteries leading to his legs and to one kidney, causing poor renal function, blue-colored feet, and toenail loss.  In his disability application, Abbott claimed that these conditions prevented him from walking or standing for more than 10 to 20 minutes before having to rest.  He also said that he could not sit for more than two hours at a time because his knee would start to throb.

In advance of his hearing before the ALJ, Abbott (who was represented by counsel) submitted a brief arguing that he should be found disabled as a direct application of the Medical-Vocational Guidelines ("the grids").  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  The grids reflect the Social Security Administration's determination that certain combinations of age, education, work experience, and exertional limitations direct a finding of either disabled or not disabled at step five of the disability analysis.  20 C.F.R. § 404.1569; *id.* Pt. 404, Subpt. P. App. 2 § 200.00(a); *see Haynes v. Barnhart*, 416 F.3d 621, 627-30 (7th Cir. 2005).  Abbott rested his hopes on Rule 201.06 of the grids, a rule affecting claimants 55 years or older who are limited to sedentary work and whose education does not provide them with the ability for skilled work.  That rule directs a finding of disabled if a claimant acquired no skills from his past work that would transfer easily to another skilled or semiskilled job.  If, however, the Commissioner proved that the claimant had transferable skills, he would not be deemed disabled.

Abbott detailed his past work experience in his 2000 and 2004 disability applications.  He explained that he had held several positions at a special education school from 1985 to 1999.  He started as a "job coach," but in 1991 he switched to the position of "teacher's aide," which he held only for a few months until he injured his knee while restraining a student.  After the injury Abbott could no longer restrain students, and so the school created for him the position of "transporter," which, he explained, consisted of driving students to their jobs and classes.  He performed these duties from 1992 until he lost his job in 1999, and did not work again.

At the hearing a conflict developed between Abbott and the vocational expert ("VE") about the nature of Abbott's past work. The VE attributed to Abbott more responsibilities that would lead to transferable skills than Abbott reported having. For example, Abbott testified that as a teacher's aide, he would monitor the students to make sure that they behaved but was not involved in any teaching activities. The VE, on the other hand, testified that based on his general understanding of what a teacher's aide did, Abbott would have helped the teachers implement their lesson plans and would have learned how to deal with students with emotional problems. Abbott also testified that as a job coach, he would accompany students to their jobs and monitor them to ensure that they did not misbehave, but that he did not place students at jobsites, evaluate their performances, or train them except for an occasional demonstration of simple tasks, like how to mop. The VE, however, believed that Abbott gained experience training students with behavioral or emotional problems on how to do their jobs and would interact with employers to evaluate a student's performance and create work goals. The VE stated that his testimony was based on his personal knowledge of the job-coach position at the school where Abbott had worked, as reflected in the grant proposal when the program was created, and through past work he had done with other job coaches at the school when he worked in the mental health field.

The VE then testified that Abbott's acquired skills would be directly transferable to the job of caseworker. That job, the VE added, was performed at the sedentary level and could accommodate the additional restrictions identified by the ALJ in his hypothetical questions. But if Abbott's job tasks were as narrow as he described them, the VE said, Abbott would have no transferable skills.

To bolster his testimony about his limited job duties, after the hearing Abbott submitted an affidavit from the teacher in whose classroom his desk was located when he was a transporter. The teacher asserted that Abbott would help monitor student behavior when he was not driving, but that he was not involved in any academic work. The teacher did not know what Abbott did as a job coach.

The ALJ concluded that Abbott was not disabled by the end of 2004, his date last insured. Following the familiar five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ found that Abbott had not performed substantial gainful activity from the alleged onset date (step one), and he identified coronary artery disease and arthritis of the left knee as impairments that were severe (step two) but did not meet or equal a listed impairment (step three). The ALJ then turned to Abbott's residual functional capacity ("RFC") and concluded that Abbott could still perform sedentary work with additional restrictions to accommodate his medical impairments. Based on these restrictions, the ALJ determined that Abbott could not perform his past work as either a job coach or a teacher's aide (step four). The ALJ then proceeded to step five, at which the Commissioner bore the burden to prove that Abbott

could perform other jobs, which, because of the grids, were limited to skilled sedentary work that could accommodate his additional restrictions and that utilized his acquired work skills.

At step five, the ALJ found that as a job coach Abbott had acquired skills that would transfer to the job of caseworker with no adaptation. The ALJ did not list the specific skills associated with the job-coach position, however, stating only that "[t]he vocational expert testified that the claimant's past relevant work as job coach was skilled and that the claimant had transferable work skills." The ALJ acknowledged that Abbott's testimony at the hearing contradicted the VE's understanding of the skilled nature of his work as a job coach, but the ALJ discounted Abbott's testimony because of his "major memory deficits" at the time of the hearing. The ALJ also found that the teacher's affidavit did not address Abbott's duties as a job coach and therefore did not affect the analysis.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981. Abbott sought review of the denial of benefits in the district court, and a magistrate judge proceeding by consent affirmed the decision.

## II. Analysis

### A. Transferability of Work Skills

Abbott devotes most of his brief on appeal to challenging the ALJ's determination that he had acquired work skills that were transferable to the job of caseworker with no adaptation. He argues that the ALJ erred by crediting the VE's description of his job duties over his. His own testimony, Abbott contends, demonstrates that he did not acquire any transferable skills as a job coach. Alternatively, Abbott argues that even if he did acquire some skills, they did not transfer to a caseworker position.

Abbott's argument, however, misses a key point that itself requires a remand: the ALJ did not identify the specific skills Abbott had acquired as a job coach, let alone explain how those skills would transfer to the caseworker position. By omitting his reasoning on these points, the ALJ provided no basis upon which we can conduct our review and, furthermore, violated a directive found in Social Security Ruling 82-41. When transferability is material to the outcome, S.S.R. 82-41 requires an ALJ "to make certain findings of fact and include them in the written decision." Those findings of fact include "the acquired work skills" and the "specific occupations to which the acquired work skills are transferable." S.S.R. 82-41(6). Relying on S.S.R. 82-41, courts have vacated judgments in disability cases in which the ALJ failed to identify the claimant's acquired work skills or to make specific findings about the transferability of skills and those findings were material to

the outcome. *See Key v. Sullivan*, 925 F.2d 1056, 1062-63 (7th Cir. 1991)[1]; *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1223-26 (9th Cir. 2009); *Draegert v. Barnhart*, 311 F.3d 468, 472-77 (2d Cir. 2002); *Dikeman v. Halter*, 245 F.3d 1182, 1184-88 (10th Cir. 2001). *But see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548-50 (6th Cir. 2004) (requiring ALJ to make specific findings of fact about transferable skills only if ALJ relied solely on the Medical-Vocational Guidelines without resort to outside expert). The transferability of skills is a determination entrusted to the ALJ, not the VE, *see* S.S.R. 82-41(a)(3); *Bray*, 554 F.3d at 1225, and we review the actual reasons given by the ALJ without speculating about what the ALJ might have considered, *see Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Therefore, we remand the case so that the ALJ can identify Abbott's acquired work skills and explain why he would need to make "very little, if any, vocational adjustment" to a different job. 20 C.F.R. § 404.1568(d)(4).

One of Abbott's arguments on appeal demonstrates why the ALJ's findings of fact are necessary. Abbott notes that because of his advanced age and limitation to sedentary work, the ALJ must consider whether the work required of a caseworker is so similar to the work of a job coach that he "would need to make very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry." 20 C.F.R. § 404.1568(d)(4); *see* S.S.R. 82-41(4)(c) (defining very little adjustment as being able "to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation"). Abbott proceeds to argue that the caseworker position is more complex than the job-coach position, as evidenced by the higher "Reasoning Development" level listed in the Dictionary of Occupational Titles ("DOT"), and requires a larger underlying base of knowledge. These factors, he continues, mean that he would have to make significant vocational adjustments as a caseworker. But because the ALJ did not give his reasons for concluding that Abbott would have to make very little adjustment, it is impossible to tell whether the ALJ considered the different job requirements or how he resolved the issue.

### B. Role of Memory Deficits in Discounting Abbott's Testimony

Abbott also objects to another aspect of the ALJ's decision regarding the transferability-of-skills analysis: the ALJ discounted Abbott's hearing testimony about his past work based solely on "memory deficits." Abbott does not dispute suffering some short-term memory loss, but he insists that this does not affect his long-term memory or his

---

[1]The *Key* decision relied on Social Security Ruling 82-41 without citing to it explicitly. The decision quotes directly from the ruling but mistakenly attributes it to S.S.R. 1982, which does not exist. *See* 925 F.2d at 1062.

account of his past work.  He notes that his hearing testimony is corroborated by his written accounts of his past work, and those accounts go back to 2000, predating his memory impairments.

Although we review credibility findings deferentially, upholding all but patently wrong conclusions, *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009), the ALJ's credibility findings must be reasoned and supported by the record, *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).  Here, the record amply supports that Abbott suffers from short-term memory loss but is silent regarding any effects on his long-term memory.  The ALJ did not support his finding of long-term memory deficits with any examples from the hearing or the record, nor did he discuss how Abbott's history of consistent statements about the teacher's aide and transporter positions affected his assessment of Abbott's memory.  It is true that Abbott did not describe his job-coach position in his applications (focusing instead on the more recent positions), but if he could accurately describe the later positions, the ALJ should have addressed why Abbott's recollection of his duties as a job coach would be different.

### C.  DOT Classification of Job Coach

Abbott's remaining argument about his work history concerns the classification of job coach in the DOT.  He argues that the VE's testimony is unreliable because he based his classification of the job-coach position on a nonexistent DOT entry.  The VE classified the job-coach position as an "Employment Training Specialist," DOT Code 094.224-022, but, Abbott says, no such listing appears in the DOT.  According to Abbott, this omission casts doubt on the VE's reliability.

This is an issue that can be resolved on remand.  According to the Commissioner's brief, the listing for Employment Training Specialist was developed after the last edition of the DOT was published in 1991 and so is not found in the published version but is available elsewhere.  At oral argument, the lawyer for the Commissioner explained that she found the listing through the Occupational Network Database (O*NET), a database that the Department of Labor developed to replace the now-defunct DOT and that has crossreferences to the old DOT listings.  *See* O*NET OnLine, http://online.onetcenter.org/. Our review of O*NET reveals that Employment Training Specialist, DOT Code 094.224-022, corresponds to "Educational, Vocational, and School Counselor," O*NET Code 21-1012.00, but the associated tasks differ from those identified by the VE.  This discrepancy and its import, if any, can be addressed on remand.

## D. Residual Functional Capacity

The remaining issue is whether we should send the case back for an entirely new decision or if we should limit the remand to just the issue of transferability. Abbott wants a full remand, arguing that the ALJ's RFC determination was flawed and that his capacity for work is less than the ALJ found. He contends that the ALJ overlooked several of his impairments and improperly discounted his complaints of pain and the effect of his symptoms on his daily activities.

Abbott's complaints on appeal about the RFC determination are slightly inconsistent with his position at the hearing before the ALJ where he focused more on proving an RFC of sedentary work or less (to take advantage of the rules in the grids) than on proving total disability. That being said, the ALJ has a duty to examine all of the evidence in the record, 20 C.F.R. § 404.1545(a)(3), and his decision must be supported by substantial evidence, *Simila v. Astrue*, 573 F.3d 503, 5413-14 (7th Cir. 2009). Here, some errors in the ALJ's decision lead us to conclude that a full remand is appropriate. First, the ALJ glossed over the treatment of Abbott's peripheral vascular disease. The ALJ concluded that Abbott's lower-extremity problems were "transitory" based on the Abbott's normal electromyography ("EMG") results. But EMG tests for neural and muscular problems and does not rule out the circulation problems that Abbott complains of. *See* MedlinePlus, Electromyography, http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (last visited July 21, 2010). A consulting doctor who examined Abbott in January 2005—months past the circulation problem's onset in August 2004—noted that Abbott's toes were "purple and cold," further suggesting that the ALJ should have factored this impairment into his analysis. Second, the ALJ may have overlooked pertinent evidence regarding Abbott's claim of disabling pain. The ALJ relied on Abbott's initial disability application to find that Abbott's pain medicine was limited to Ibuprofen and nothing stronger. But the initial application was filed before Abbott's 2004 heart attack, and the ALJ did not mention other evidence in the record reflecting that later in 2004 Abbott was prescribed strong pain relievers, including hydrocodone, Neurontin, Darcovet, and Tylenol #3. This omission suggests that Abbott's pain may have been more substantial than the ALJ believed, casting doubt on the reliability of the ALJ's final conclusions.

## III. Conclusion

For the foregoing reasons, we remand to the agency so that the ALJ can review his RFC assessment and provide findings of fact about Abbott's acquired skills and how those skills transfer to the job of caseworker.