NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 25, 2011
Decided March 4, 2011

*Before*

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 10-2270

| | |
|---|---|
| ROMELL R. CARTER, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, |
| | Eastern Division. |
| *v.* | |
| | No. 08 C 1673 |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | Elaine E. Bucklo, |
| *Defendant-Appellee.* | *Judge.* |

## O R D E R

An Administrative Law Judge granted Romell Carter disability benefits for one year based on an injury to his foot, but the Appeals Council remanded that decision when it could not find audio tapes of the hearings necessary to review Carter's argument that he is also disabled by depression and should have been awarded benefits through the date of the ALJ's decision. A second ALJ issued the identical award in a comprehensive, 38-page opinion. This time the Appeals Council declined review, and the district court upheld the ALJ's decision. Because substantial evidence supports the ALJ's denial of further benefits, we affirm the judgment.

I.

Carter was working as a cargo handler for Northwest Airlines in July 1999 when two forklifts collided and crushed his right foot. He underwent two surgeries, rehabilitation, and treatment from two orthopedic specialists. His doctors cleared him to return to light-duty work in January 2000 and full-duty work in March with some restrictions on his right leg. Carter applied for workers' compensation benefits following the accident and was awarded intermittent benefits. He also filed for Disability Insurance Benefits and Supplemental Security Income in February 2000, but his claim was denied, and he did not seek reconsideration. Carter again filed for DIB and SSI in December 2000, and after his initial claim and request for reconsideration were denied, he requested a hearing before an ALJ.

In November 2001, after making that request, Carter sought treatment at the emergency room at Cook County (now Stroger) Hospital for suicidal ideation. He reported that since his foot injury in 1999 he had felt angry and wanted "to go off." Carter was not admitted to the hospital, but a psychiatrist diagnosed him with mild to moderate depression and prescribed 50 milligrams of Zoloft. Carter never filled the prescription, but when he returned to the Fantus Clinic at Stroger Hospital for a follow-up visit in December, he complained to Dr. Achutha Shenoy that the Zoloft had not helped his depression. Dr. Shenoy responded by increasing the dosage to 100 milligrams. Carter never filled that prescription either, but a month later on his next visit he reported that he still felt depressed and hopeless, and was suffering from poor concentration and insomnia. Dr. Shenoy increased Carter's dosage to 200 milligrams and prescribed 5 milligrams of Zyprexa, which treats bipolar disorders. He diagnosed Carter with major depression with paranoid features and rated his Global Assessment of Functioning ("GAF") as 52, which indicates moderate symptoms and limitations. Dr. Shenoy also reported that Carter was experiencing a 20% to 50% reduced capacity in his concentration, persistence, and pace. Carter filled the prescriptions for Zoloft and Zyprexa, but then waited three months after the medicine should have run out before he refilled the scripts.

A few weeks after Carter's second visit with Dr. Shenoy, his lawyer arranged for a psychological assessment. Dr. Michael Rogers, a psychiatrist, spent an hour evaluating Carter. He reported that Carter suffered from obesity and that his depression was under "reasonably good control" because of the medicine. Still, Dr. Rogers rated Carter's GAF at 30 (suggesting serious impairments in Carter's ability to function) and recommended increasing the dosage of Zyprexa based on Carter's complaint that he was experiencing paranoid delusions.

In April 2002, Carter returned to the Fantus Clinic, where he told a medical student that he was having trouble sleeping and was feeling paranoid and hopeless. The medical student adjusted Carter's medications, switching him from Zoloft to another antidepressant, Effexor, and increasing his dosage of Zyprexa. But Carter continued refilling his old prescription for Zoloft, never filled the script for Effexor, and went for six months without Zyprexa before filling the new script.

A few days after that appointment, the first ALJ, Steven Templin, conducted a hearing on Carter's claim, but no transcript is available due to the missing audio tape. After that hearing ALJ Templin ordered a psychological evaluation, and Dr. Gregory Rudolph, a clinical psychologist, examined Carter for two and a half hours. Carter told the doctor that he was living by himself in Aurora, Illinois, and had no friends and few interests. Dr. Rudolph administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and concluded from the results that Carter had embellished, at least to a degree, his neurotic and psychotic symptoms. The doctor acknowledged Carter's history of depression, as well as alcohol abuse, but opined that the depression was in remission and controlled by medicine. Dr. Rudolph rated as "excellent" or "good" nearly all of Carter's work-related abilities, including his ability to maintain attention and concentration for extended periods. He gave a lower rating of "fair" only as to Carter's abilities to perform at a consistent pace and to accept instructions and respond appropriately to criticism from supervisors, meaning that Carter can perform those tasks some of the time.

ALJ Templin conducted a second hearing in July 2002. Carter and two medical experts testified, but again there is no transcript. The next month, before ALJ Templin issued his written decision, Dr. Blaise Wolfrum, a psychiatrist, examined Carter for one hour at the request of Carter's workers' compensation insurer. Carter reported that he had gained 30 pounds in the previous 2 years and presently was homeless. Dr. Wolfrum diagnosed him with major depression with psychotic and paranoid features and opined that the condition stemmed from Carter's foot injury in 1999. He noted that the drowsiness Carter reportedly experienced as a side effect of his medications might hinder his ability to work and rated his GAF as 40, explaining that Carter "has some impairment in reality testing and is unable to maintain relationships with friends or work." Still, Dr. Wolfrum opined that with reasonable accommodations Carter could function well at work and interact well with others.

In late August 2002, ALJ Templin concluded that Carter's injured right foot had rendered him disabled for one year after his July 1999 injury. Carter requested review of that decision by the Appeals Council because, he insisted, his foot injury as well as his depression rendered him disabled from the date of the injury through August 23, 2002, the date of the decision. The Appeals Council did not decide that question but instead

remanded the matter in 2004 because it could not find the audio tapes of the 2002 hearings. Another hearing was ordered, but by then ALJ Templin no longer was in Chicago, so the case was reassigned to ALJ Helen Cropper, whose decision we now are reviewing.

Meanwhile, one of Carter's orthopedic surgeons referred him to Dr. Leonard Elkun, a psychiatrist, for treatment of his depression. Dr. Elkun began treating Carter in April 2003, and his progress notes reflect that Carter reportedly was taking Zoloft and Zyprexa as prescribed but continued to suffer from depression, suicidal thoughts, and insomnia. Carter also had told Dr. Elkun that he was self-medicating with alcohol. Dr. Elkun sent several reports to the insurance agency handling Carter's workers' compensation claim. In his first letter dated May 2003, Dr. Elkun reported that Carter suffered from a chronic depressive disorder and a delusional disorder. He also stated that Carter "has been totally unable to work since the time of his accident in July 1999" and opined that Carter's psychological problems were directly linked to that accident.

The insurance agency arranged for Dr. Mark Mosk, a clinical psychologist, to examine Carter in February 2004. Carter reported to Dr. Mosk that he had lost interest in social activities and he spent his time in court or at depositions. Dr. Mosk administered the MMPI-2 but concluded that Carter's responses indicated gross exaggeration of his symptoms. The doctor diagnosed Carter with a depressive disorder and alcohol abuse but opined that neither condition prevented Carter from working. He also noted in his report that Carter is a malingerer and surmised that "his interest in pursuing secondary gain" played a significant role in his failure to return to work.

On remand from the Appeals Council, ALJ Cropper conducted two more hearings, both in 2005. At the first hearing Carter initially maintained that he had not worked at all since his foot injury in 1999, but when pressed by the ALJ he admitted that he occasionally fixed his friends' computers for money and said he had delivered pizza one night per week for about six months until his depression prevented him from working. The ALJ later issued a subpoena for Carter's workers' compensation file, however, which included an affidavit from the pizza restaurant revealing that Carter had worked there once a week for about eight months during 2000 and 2001 and for eight months in 2004. Carter also described working as a disc jockey and broadcasting two radio shows (without pay) before his injury in 1999, but asserted that he had not done any similar work since then.

As for his daily activities, Carter reported that he occupies most of his time watching TV or playing games on the computer, but also cleans his apartment, goes to the store a few times a week, and spends weekends with his three daughters or his girlfriend. He also admitted that he continued to disregard Dr. Elkun's admonition that he should not be drinking alcohol while on antidepressants, but he maintained that drinking helps him feel

better.  He told the ALJ that he owns a car and drives using his left foot.  But Carter insisted that he could not hold a job because he is always tired and is frequently angry.  He also described feeling depressed constantly and being unmotivated to do anything or go out, and feeling as though people were watching him and "trying to get something" on him.

The ALJ and Carter's attorney posed hypothetical questions to a vocational expert.  The VE testified that someone limited to sedentary work would be unable to perform any of Carter's past work, including cooking at Taco Bell, doing customer service at Blockbuster, packing pharmacy supplies, and delivering pizzas.  But, the VE continued, that person still could work in assembly positions, inspection jobs, or clerical positions, all of which are available in significant numbers in the greater Chicago area.  The VE also explained that these jobs require an employee to stay on task 85% of the time, so if the worker's drowsiness meant that he could not maintain that level of productivity, no jobs would be available.

After the first hearing ALJ Cropper searched the Internet for Carter's disc-jockey name, DJ Romell Chilly C, and discovered that, despite his contrary testimony, he still was an active DJ.  She sent the information she found to Carter's attorney, who requested a supplemental hearing.  At the second hearing the ALJ questioned Carter extensively about his DJ activities.  Carter now said that, as a hobby, he produced a weekly radio show and distributed e-mail newsletters.  He estimated that he spent two days each week recording his show and had missed only three or four shows in the last year.

ALJ Cropper issued her decision in January 2006.  She concluded, as had ALJ Templin, that Carter's injured right foot, but not his depression, rendered him disabled only between July 1999 and July 2000.  ALJ Cropper performed the five-step analysis under 20 C.F.R. § 404.1520a and concluded that Carter had not engaged in substantial gainful activity since 1999 and that his foot injury, mild obesity, alcohol dependence, and depression constituted severe impairments.  But at Step 3 the ALJ determined that none of these impairments met the listing requirements for a disability and that Carter had not experienced "marked functional limitations caused by mental illness."  She highlighted his "relatively normal daily and social activities," including his frequent trips from his apartment in Aurora to Chicago to visit to his girlfriend, his weekly radio show, and his active relationship with his three daughters.  She also pointed out that Carter did not seek treatment for his depression until 2001, and even then only sporadically until 2003 when he began treatment with Dr. Elkun.

At Step 4 ALJ Cropper evaluated Carter's mental residual functional capacity, concluding that his depression did not prevent him from performing at least unskilled work.  She recounted his medical history, noting the conflict in the opinions of his treating and examining doctors and questioning the validity of these opinions because of Carter's

inconsistent reports to his doctors.  She acknowledged the potential bias of several opinions because they were prepared for Carter's workers' compensation claim.  The ALJ also discredited Dr. Elkun's opinion that Carter was unable to work.  She pointed out that Dr. Elkun had not assessed Carter's mental RFC, and she characterized the doctor's narrative opinions as "somewhat inconsistent" because he had described Carter as completely unable to work but still encouraged him to pursue a technical education to improve his job prospects.  She also questioned the reliability of Dr. Elkun's opinion because Carter had not disclosed that he occasionally worked delivering pizzas.  Finally, she faulted Dr. Elkun's reports because they were based on the assumption that Carter had been taking his medicine consistently, when prescription records reveal that Carter went months without filling scripts.

The ALJ similarly discredited Carter's testimony about the disabling effects of his depression, based on a number of inconsistencies in his statements.  For example, although Carter testified that he has few interests in life, the ALJ recounted his active social life.  Furthermore, the time and effort Carter put into producing his radio show and his desire to return to school, she reasoned, demonstrated a good ability to concentrate and stay on task.  She also noted that both doctors who administered the MMPI-2 had reported that the results were "not valid" because of Carter's exaggerated statements, and one opined that he was malingering.  The ALJ also highlighted Carter's lies and omissions.  He had told his doctors that his medications were not alleviating his depression, when in fact he went for months at a time without taking the drugs.  Carter also had told Dr. Wolfrum that he was homeless at the time of his evaluation, when three months earlier he had told Dr. Rudolph that he lived in an apartment in Aurora.  And, the ALJ continued, Carter had given an incomplete account of his work history in his application for benefits; he failed to disclose his work delivering pizzas after his foot injury.  Neither did he mention his radio show until the ALJ found out on her own and confronted him about it at the supplemental hearing, even though she had asked him about his DJ activities at the first hearing.  She also pointed out that, against the advice of Dr. Elkun, Carter continued to drink alcohol while taking his antidepressants.  Finally, she noted that Carter was actively involved in litigation not only for workers' compensation benefits, but also for race and disability discrimination against his former employer.  Carter's "substantial financial interest" in the outcome of these claims, she continued, likely had adversely affected his interest in returning to work.

ALJ Cropper then concluded that Carter's physical RFC had rendered him unable to perform any work from July 1999 to July 2000, but that at all times he had the mental RFC to perform at least unskilled work.  The ALJ also found that Carter's alcohol use was not a contributing factor to his disability.  At Step 5 she found that by July 2000 he was able to perform a wide range of sedentary work, including his past work cooking at Taco Bell, doing customer service at Blockbuster, packing pharmacy supplies, and delivering pizzas.

Therefore, she concluded, he was not disabled after July 2000. Carter had already received benefits for that period, so the ALJ's decision, though partially favorable, did not afford any additional relief.

## II.

Because the Appeals Council declined review, we review the ALJ's decision as the final decision of the Commissioner. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). We confine our review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943); *Spiva v. Astrue*, No. 10-2083, 2010 WL 4923563, at *6 (7th Cir. Dec. 6, 2010).

Although Carter maintains that his foot injury led to his depression, he does not argue that the injury itself is disabling. The injury was the genesis of his application for benefits, but at this point the case turns entirely on ALJ Cropper's findings about his depression. Carter argues that the ALJ gave insufficient weight to Dr. Elkun's opinion that his mental impairments rendered him unable to work. A treating physician's opinion is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *see Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). But if the ALJ finds that the opinion is internally inconsistent or contradicted by other evidence, she may discount it, as long as she provides an adequate explanation for doing so. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). Here, the ALJ did just that. She acknowledged that Dr. Elkun had treated Carter for over two years but detailed several reasons for discounting his opinion: he did not prepare a Psychiatric Review Technique Form, his notes were based on Carter's false reports of regularly taking the prescribed antidepressants, and his narrative opinions were "somewhat inconsistent" in that he found Carter unable to work but still recommended that he return to school to improve his job prospects.

Carter also asserts that ALJ Cropper should not have disregarded the VE's testimony that Carter would be unable to maintain a job if he could not concentrate 85% of the time. He elaborated on this point at oral argument, contending that the ALJ did not determine whether Carter could maintain concentration for 85% of the time. But as the Commissioner points out, the VE testified only in hypothetical terms. And the ALJ acknowledged the conflicting evidence in the record regarding Carter's ability to concentrate. In January 2002, Dr. Shenoy reported that Carter was then experiencing a 20% to 50% reduced capacity in his concentration, persistence, and pace. But in May 2002, Dr. Rudolph opined that Carter's ability to maintain attention and concentration for extended periods and to complete a normal workday was "good," meaning that most of the time he can perform work activities

satisfactorily.  The ALJ credited Dr. Rudolph because he completed a detailed mental RFC assessment and evaluated Carter after Dr. Shenoy.  Moreover, she inferred from the time and effort Carter put into producing his radio show and his desire to return to school that he was fully able to concentrate and complete tasks.

Carter next contends that the ALJ erred because she did not recruit a medical expert to complete a Psychiatric Review Technique Form.  But he waived this argument by not raising it in the district court.  *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  And in any event, the argument is unavailing because the agency regulations were changed in 2000 and no longer require that a PRTF be completed in every case.  *See Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008); *Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008).

Carter also contests the ALJ's finding that he is not credible and maintains that she merely employed the boilerplate credibility language that this court has consistently criticized.  *Spiva*, 2010 WL 4923563, at *1; *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010).  But this contention is simply inaccurate.  The ALJ dedicated nearly three pages of her opinion to detailing her adverse credibility finding.  For example, she highlighted Carter's failure to disclose his radio show and his misrepresentations about taking his medicine consistently.  Carter does not dispute these reasons.  Instead he argues that the ALJ focused only on the daily activities that he could perform and that she ignored his limitations, none of which he identifies, other than recounting at length his diagnosis of depression.

Carter then lists a number of other contentions relating to his medications and examining physicians, but he has not developed an argument for any of them.  "[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver."  *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010); *see Johnson v. Apfel*, 189 F.3d 561, 562 (7th Cir. 1999).  And even if Carter had not waived these contentions, they all would fail.  He states that the ALJ overlooked the side effects of his medications but does not specify which side effects she ignored.  Regardless, the ALJ made repeated references to Carter's drowsiness, trouble sleeping, dry mouth, and decreased libido, but concluded that these side effects did not prevent him from working.  Carter also maintains that the ALJ ignored the findings of Dr. Shenoy, Dr. Rogers, and Dr. Wolfrom and omitted material evidence such as Carter's foot injury.  To the contrary, the ALJ thoroughly recounted and analyzed the opinions of each of Carter's numerous treating and examining physicians in her comprehensive opinion, acknowledged any conflicts, and cited her reasons for adopting one opinion over the other.  Moreover, Carter's contention that the ALJ ignored his foot injury is completely unfounded, as the ALJ granted him benefits based on the injury.

Finally, for the first time in his reply brief Carter argues that ALJ Cropper did not properly analyze whether his depression met the listing requirements because, he contends, she ignored what he characterizes as episodes of decompensation. In great detail Carter recounts *Larson*, 615 F.3d at 744, seemingly for its discussion of such episodes. But Carter waived this argument by raising it for the first time in his reply brief, *United States v. Lupton*, 620 F.3d 790, 807 (7th Cir. 2010), *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009), and by failing to raise it in the district court, *Skarbek*, 390 F.3d at 505; *Schoenfeld*, 237 F.3d at 793; *Shramek*, 226 F.3d at 811. And even had he not, the argument still would fail. Even assuming Carter experienced repeated episodes of decompensation, these episodes alone would not establish a disability. Carter also would have to show marked limitations in his daily living, social functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpart P., App. 1 § 12.04(B). But the ALJ concluded that Carter suffered no "marked functional limitations" in these areas, and Carter identifies no contrary evidence.

AFFIRMED.