NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2012
Decided August 21, 2012

*Before*

WILLIAM J. BAUER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 11-3013

| | |
|---|---|
| JAMES W. MUELLER,<br>    *Plaintiff-Appellant*,<br><br>    *v.*<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security,<br>    *Defendant-Appellee*. | Appeal from the United States District Court for the Central District of Illinois.<br><br>No. 10-1343<br><br>Michael M. Mihm,<br>*Judge*. |

## O R D E R

James Mueller, a 42-year-old former factory worker with a history of mental illness, appeals from the district court's decision upholding the denial of his application for supplemental security income. Because the administrative law judge failed to explain why she found Mueller not credible and why she rejected the opinion of his treating physician, we have no choice but to reverse and remand for further proceedings.

## I

Over the years, Mueller has worked in a variety of temporary jobs, including roofer, receiver and shipper of parts at a factory, and laborer. Most recently, he had a position as a temporary shipping clerk filling out paperwork, but he lost his job after about a month because he was unable to keep up the required pace. He lost two previous jobs for similar reasons. Mueller has had other problems, too. His work history is spotty because he spent time working for himself, so that he could get away with dealing drugs; at one point he was incarcerated.

On October 29, 2008, Mueller applied for supplemental security income, asserting that he has been disabled since September 1, 2008. (There was an earlier application for benefits in 1993 that was denied, perhaps because of his past drug use. It is not relevant to the present appeal.) A few months earlier he had called a crisis worker saying that he felt as if he was going insane and that he was overwhelmed. He reported suicidal thoughts and an inability to sleep. At the time he was taking Prozac for depression. During an examination several days after the call, Mueller described mood swings, anger, racing thoughts, trouble sleeping, depression, OCD, and impulsivity.

Mueller went to the emergency room in August 2008, complaining that he had been experiencing suicidal thoughts for about six weeks. He was admitted to the adult psychiatric unit, where doctors diagnosed him with bipolar disorder, prescribed Risperdal (an anti-psychotic used to treat schizophrenia and bipolar disorder), and released him after a week. Mueller saw psychiatrist Dr. Scott Wright in September. He reported to Dr. Wright that he was feeling better on the Risperdal, but that he had continued problems with sleeping. Dr. Wright recorded that Mueller reported "classic manic symptoms such as irritable mood, mood swings that last for more than four days at a time, decreased need for sleep." Mueller described his memory as poor and scattered and his concentration on Risperdal as "still pretty bad." Dr. Wright increased Mueller's dosage of Risperdal. Mueller next saw Dr. Wright in November, at which time Dr. Wright described Mueller's mood as "kind of nervous" but not depressed. His concentration was "okay" and his energy was low.

Several state-agency consultants evaluated Mueller's application. Dr. Jane Velez, a clinical psychologist, interviewed Mueller in January 2009 and learned that his medication was keeping him mostly "on an even keel" and that he had not been suicidal for a while. The medication also was controlling the auditory and visual hallucinations that he had experienced. She evaluated Mueller as "mildly anxious," with adequate attentional capacity and intact short-term and long-term memory, and she concluded that he has the capacity to maintain a regular schedule and the pace and endurance to perform at a consistent acceptable rate. That same month Dr. Joseph Mehr reviewed Mueller's medication records, including Dr. Velez's evaluation, and assessed Mueller's mental residual functional capacity. Dr. Mehr

found Mueller moderately limited in his ability to understand, remember, and carry out detailed instructions but able to understand and remember instructions for routine and repetitive operations.

After the agency denied his application, Mueller requested reconsideration and apparently sought out further assessments from Dr. Wright. Dr. Wright completed a medication evaluation report in February 2009 stating that Mueller was "doing well" and did not have problems with mood, sleep, appetite, or energy. He indicated that Mueller's symptoms were "somewhat better." He also completed a mental-impairment questionnaire for Mueller in March 2009. Dr. Wright described clinical findings of poor concentration, sleep problems, unstable moods, poor and scattered memory, restlessness, irritability, impulsivity, and racing thoughts. He characterized Mueller as having "no useful ability" to understand and remember detailed instructions. Mueller could not, in his opinion, meet competitive standards in maintaining attention for a two-hour segment, maintaining regular attendance, making simple decisions, getting along with co-workers, responding to changes, dealing with normal work stress, carrying out detailed instructions, and maintaining socially appropriate behavior. Dr. Wright predicted that these impairments would cause Mueller to be absent from work more than four days per month. Mueller had, Dr. Wright thought, "marked" difficulties in maintaining concentration, persistence, or pace. Dr. Wright expected that Mueller would experience one to two episodes of decompensation each year. Progress notes from Mueller's monthly counseling sessions round out the medical evidence. In April 2009 another state-agency consultant reviewed the initial case file and the new evidence gathered at the reconsideration level and agreed with the prior agency assessment that Mueller could perform unskilled work.

After his request for reconsideration was denied, Mueller requested a hearing before an ALJ. That hearing took place in May 2009. Mueller testified that he lives with his mother, sister, and nephew. At home, Mueller said, he mows the lawn and picks up after himself and mainly sits around watching eight to nine hours of television a day; he likes to fish and goes camping once or twice a year. He stated that he previously used methamphetamine and marijuana but had stopped at least two years before the hearing. Mueller told of going to the hospital because he wanted to kill himself the year before. He explained his obsessive concerns with cleanliness and organization. He testified that he has problems concentrating and finishing what he starts, and he experiences auditory hallucinations that are controlled by Risperdal. Mueller also said he suffers from mood swings and goes from feeling happy to angry very quickly.

Relying on the ALJ's hypothetical, a vocational expert testified that a person who could do routine, repetitive unskilled work could perform a number of Mueller's past jobs and other work within the economy. Mueller's attorney questioned the VE about the availability of jobs for a hypothetical person who could not maintain a high level of productivity; the VE responded that such a person might be unable to maintain employment. The VE also

acknowledged that, generally, more than two days of absence per month or a need for more breaks than normal would be unacceptable to employers.

The ALJ issued her opinion in June 2009. The opinion, to put it charitably, does not bear the mark of careful work. To start with, it inexplicably refers to Mueller as a female throughout. The ALJ performed the five-step analysis under 20 C.F.R. § 404.1520(a). At Step 1 she concluded that Mueller had not engaged in substantial gainful activity since October 2008. At Step 2 she discussed Mueller's testimony about his daily activities, attempted suicide, mood swings, and obsessive thoughts and concluded that his depression and anxiety constitute severe impairments. But then in one sweeping sentence she dismissed Dr. Wright's opinion that Mueller's impairments leave him unable to perform a number of mental activities required to work:

> The opinion by Dr. Wright that the claimant is unable to perform many mental activities of work is directly contradicted by the claimant's description of her daily activities, by the objective medical evidence of record, by the assessments of other mental health professionals, by the observations of the claimant, and by the claimant's ability to perform work in the past with her current mental illness and symptoms.

At Step 3 the ALJ determined that none of Mueller's impairments met the listing requirements for a disability and that Mueller had not experienced the "marked" limitations caused by mental illness. (The adjudicator evaluates the level of severity of a claimant's mental impairment at Steps 2 and 3 of the sequential evaluation by rating the claimant's limitations and restrictions in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). These four functional areas correspond to the requirements of "paragraph B" of the agency's mental-impairment listings.) The ALJ found him to be mildly restricted in activities of daily living and social functioning, and moderately limited with regard to concentration, persistence, and pace. She acknowledged that Mueller had experienced one episode of decompensation.

At Step 4 the ALJ evaluated Mueller's mental residual functional capacity, concluding that his depression did not prevent him from performing "a broad range of unskilled work." She found that Mueller could tolerate frequent—though not constant—interaction with others in a work setting despite his mental impairments. The ALJ stated that "[n]o credible treating, examining, or reviewing medical source has reported that the claimant is disabled or unable to work." She rejected Mueller's testimony that he cannot work, reasoning that the objective medical evidence, the absence of a source finding Mueller disabled, and Mueller's daily activities contradict Mueller's self-assessment. The ALJ wrote that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

At Step 5 the ALJ concluded that Mueller retained the mental RFC to perform his past relevant work as a bench assembler, hand packer, and construction laborer. He could also perform other unskilled jobs. These findings mandated a conclusion that he is not disabled.

## II

Because the Appeals Council declined review, we review the ALJ's decision as the final decision of the Commissioner. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). In so doing, we must confine ourselves to the rationale offered by the ALJ. See *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Mueller first argues that the ALJ gave insufficient weight to Dr. Wright's opinion that his mental impairments render him unable to work. A treating physician's opinion is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); see *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). When discounting a treating physician's opinion, an ALJ must give "good reasons." 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). The opinion before us does not meet that standard. The ALJ's entire "analysis" of Dr. Wright's assessment consists of a one-sentence declaration that Dr. Wright's opinion is inconsistent with Mueller's description of his daily activities, the objective medical evidence, the observations and opinions of other mental-health professionals, and Mueller's ability to perform work in the past with his current mental illnesses and symptoms. This is a conclusion, not a reason (or reasons). The ALJ did not explain these findings or tie them to the administrative record. Rather than defend the ALJ's work product as sufficient, the Commissioner spends *ten pages* of his brief purporting to tell this court what the ALJ must have been thinking. The Commissioner insists that this approach does not run afoul of *Chenery*, 318 U.S. at 87–88, since the agency "relies on the ALJ's stated rationale for her conclusion and is simply providing additional evidentiary detail consistent with that stated rationale."

Yet as we have said repeatedly, "what matters are the reasons articulated *by the ALJ*," not the rationale advanced by the Commissioner on appeal. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); see also *Spiva*, 628 F.3d at 353; *Larson*, 615 F.3d at 749; *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Here, we might as well have no reasons. Although the ALJ alludes to opinions of "other mental health professionals," she does not identify anyone by name or link anything said by the state-agency consultants to her rejection of Dr. Wright's opinion. See 20 C.F.R. § 404.1527(c)(2); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Mueller's "ability to perform work in the past" is especially weak support for the ALJ's rejection of Dr. Wright's opinion. Mueller's work record actually bolsters his position. He testified that he lost his last *three* jobs on account of his problems with concentration, persistence, and pace. The ALJ's assumption that Mueller's past work undercuts his present claim of disability also seems to

rest on the obviously incorrect proposition that mental illness that was not disabling in the past automatically cannot worsen later. We have observed that mental illness does not always follow a predictable trajectory. See *Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

Even if there had been sound reasons for refusing to give Dr. Wright's assessment controlling weight, the ALJ still had an obligation to determine what value his assessment did merit. See 20 C.F.R. § 404.1527(d)(2); *Larson*, 615 F.3d at 751. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561 (citing 20 C.F.R. § 404.1527(d)(2)). The record contains nothing indicating that the ALJ considered any of these factors.

Mueller argues further that the ALJ erred in finding him not credible. He correctly points out that the ALJ's initial explanation for disbelieving his testimony—that his "statements concerning the intensity, persistence, and limiting effects" of his symptoms were "not credible to the extent they are inconsistent with" the judge's assessment of his residual functional capacity—is "meaningless boilerplate seen frequently in decisions from ALJs." See *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). We have criticized this recitation as unhelpful, and worse, as implying "that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012); see *Parker*, 597 F.3d at 921–22.

Mueller also criticizes the ALJ's other reasons for discrediting his testimony. The ALJ asserted, for example, that Mueller's testimony lacked support in objective medical evidence and *thus* was unworthy of belief. But, if the ALJ thought that "objective" evidence was essential, she was wrong. Mueller's statements about his "symptoms or about the effect the symptoms have on his . . . ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p(4); *Bjornson*, 671 F.3d at 646; *Myles v. Astrue*, 582 F.3d 672, 676–77 (7th Cir. 2009). The ALJ also mishandled the evidence of Mueller's daily activities. An ALJ may consider a claimant's daily activities when assessing credibility, but she must explain perceived inconsistencies between these activities and the medical evidence. See *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). The ALJ here did not do so, and it is certainly not obvious how the very minimal activities Mueller described contradict a claim of a disabling mental disorder. See *Bauer*, 532 F.3d at 608; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Because the ALJ did not substantiate her credibility determination with references to specific record evidence, this court cannot assess whether her credibility determination was "patently wrong." See *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

These errors go to the heart of the disability determination, and so we cannot find on this record that they were harmless. See *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Indeed, the Commissioner has not argued harmless error. We assume that whatever ALJ receives this case on remand will implement this court's judgment in good faith. Although Mueller has asked for an immediate award of benefits, we do not normally do that, and we do not regard this case as a good candidate for such an action. Our only point is that the record contained evidence that would have supported an award for Mueller, but the ALJ passed over it almost in silence. Mueller is entitled to have all the evidence fairly weighed, and the reviewing court cannot do its job without the agency's explanation.

\*       \*       \*

Because the ALJ failed to explain adequately the reasoning behind the adverse credibility determination and the rejection of Dr. Wright's medical opinion, we **REVERSE** the agency's determination and **REMAND** for further proceedings consistent with this order.